**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MERSADIES BONILLA** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  20-2053** |
| | : | |
| **AMERICAN HERITAGE FEDERAL** | : | |
| **CREDIT UNION,** *et al.* | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                                                                    **May 7, 2020**

Mersadies Bonilla *pro se* seeks relief under a variety of federal consumer credit and banking statutes and regulations and Pennsylvania law relating to her credit union's handling of an August 2016 transaction after it learned of criminal charges against Ms. Bonilla arising out of the 2016 transaction ended in a *nolle pros* dismissal in March 2020.  She also sues the credit union's President Bruce Foluke,[1] its Risk Compliance Officer Danielle Basich, and one of its unidentified branch managers without distinguishing their individual liability. We granted her leave to proceed *in forma pauperis*. Congress requires we now screen her claims before issuing summons and involving defendants. Consistent with Congress's mandate, we carefully reviewed her varied and conclusory allegations.  She fails to state a claim against any Defendant under the referenced consumer credit and banking statutes but may be able to do so through an amended complaint. She lacks standing to proceed under the Dodd-Frank Act and Regulation P requiring we dismiss those claims with prejudice. We decline to exercise supplemental jurisdiction over her Pennsylvania claims until she can plead a basis for claims under federal law.

### I.      *Pro se* allegations.

Ms. Bonilla is a member of the American Heritage Federal Credit Union with a savings account and a secured credit card account.[2]  Ms. Bonilla now appears to contest three transactions

she claims the Credit Union and its employees either attempted to collect as a debt and/or inaccurately reported to credit reporting agencies:

- A savings share account and one credit account in the amounts of $1,904 and $3,334 Defendants reported to TransUnion, Experian, and Equifax as delinquent from July 2019 to early April 2020.[3]

- Defendants reported $4,818.35 to "Check Systems, Inc." as a charge-off on Ms. Bonilla's savings account beginning July 2019.[4]

- "Amount of $600.00 of secured money (property Account number 622661) taken and there is no present right to security funds and/or interest on account or money received by AHFCU January 20th of 2016 from Plaintiff."[5]

Ms. Bonilla does not plead how these events relate to one another.

### A. The August 2016 disputed transaction.

In July 2016, someone deposited money from another shareholder's account into Ms. Bonilla's account.[6] Ms. Bonilla alleges the Credit Union's unidentified branch manager, "acting outside their authority," contacted the Philadelphia Police Department to report fraud on the account.[7] A state court issued an arrest warrant for Ms. Bonilla in August 2016.[8] Ms. Bonilla denies wrongdoing with regard to the monies deposited into her savings account at the Credit Union.

The public docket reflects the Commonwealth brought charges against Ms. Bonilla in the Philadelphia County Court of Common Pleas on August 19, 2016 relating to the money the Credit Union believed was fraudulently deposited into her account.[9] The public docket shows the Commonwealth charged Ms. Bonilla with forgery; theft by unlawful taking-movable property; theft by deception–false impression; receiving stolen property; identity theft; criminal use of a communication facility; access to a device used to obtain or attempt to obtain property or services; and securing execution of documents by deception under Pennsylvania law.[10]

### B. We dismissed Ms. Bonilla's first lawsuit.

Before resolution of her criminal charges, Ms. Bonilla sued the Credit Union before us in *Bonilla v. American Heritage Federal Credit Union*.[11] She alleged in August 2016, someone made three deposits to her savings account totaling $5,600 from the account of Joyce Eubanks, another Credit Union member.[12] Ms. Eubanks contested the validity of the $5,600 in transfers and the Credit Union, along with Philadelphia Police, investigated the transfers as fraudulent.

In response to what it considered fraudulent activity, the Credit Union "reversed" the $5,600 transfer to Ms. Bonilla's savings account on September 7, 2016.[13] After debiting $5,600 against Ms. Bonilla's savings account, her account had an ending balance of negative $3,334.92. The Credit Union charged off the overdrawn savings account in December 2016 with a negative balance of $3,334.92.[14] The Credit Union first reported the charged off savings account to credit reporting agencies in January 2017.[15]

Ms. Bonilla filed a Complaint against the Credit Union on August 3, 2018, a First Amended Complaint on August 24, 2018, a Second Amended Complaint on August 27, 2018, and a Third Amended Complaint on September 12, 2018. We granted the Credit Union's motion to dismiss with prejudice all claims relating to the August 2016 transactions and without prejudice to allow Ms. Bonilla to file an amended complaint to plead timely and plausible claims regarding an alleged overdraft protection transaction.[16]

Ms. Bonilla filed a Fourth Amended Complaint alleging the Credit Union violated federal law by opening a "Deposit Account Overdraft Protection Account" added to her credit report in the amount of $3,334 beginning in August 2018.[17] She claimed the Credit Union's conduct violated the Electronic Funds Transfer Act ("EFTA"),[18] its implementing Regulation E,[19] the Truth in Lending Act, ("TILA")[20] and the Fair Credit Billing Act ("FCBA")[21] and its implementing

3

Regulation Z.[22] On April 4, 2019, we granted the Credit Union's motion for judgment on the pleadings.[23]  We found EFTA and Regulation E did not apply to Ms. Bonilla's challenge to the Credit Union's intra-institutional transfer between her account and the account of Ms. Eubanks.[24] We also found Ms. Bonilla failed to state claims under TILA, the FCBA, and Regulation Z governing the disclosure of credit terms and protecting consumers against inaccurate and unfair credit billing and credit card practices based on fees or charges involved in credit transactions.[25] We concluded the Credit Union did not engage in a credit transaction; it reversed a deposit into a savings account upon determining fraud in the deposit transfer.  The Credit Union did not charge a fee or interest, thus there is no disclosure violation.

### C.  Conduct since dismissal of *Bonilla I.*

Sometime in July 2019 the Philadelphia District Attorney's office told the Credit Union of its decision to dismiss the criminal charges against Ms. Bonilla.[26] The Philadelphia District Attorney *nolle prossed* the charges on March 11, 2020.[27]

Notwithstanding notice from the Philadelphia District Attorney's office in July 2019 it planned to dismiss charges against Ms. Bonilla and while the criminal case remained pending, "Defendants" continued to report to TransUnion, Experian, and Equifax from July 2019 through early April 2020 delinquencies in Ms. Bonilla's savings share account and credit card account in the amounts of $1,904 and $3,334.[28]  Not only did "Defendants" continue to report delinquencies to the credit reporting agencies, the Credit Union, as a "creditor," "took legal action to collect the disputed amount, threatened [Ms. Bonilla's] credit rating, reported [her] accounts as delinquent, and restricted/closed [her] account while [she] disputed charges."[29]

A "Defendant" then reported to Check Systems Inc. a charged off savings deposit account in the amount of $4,818.35 for July 2019 through early April 2020.[30]  Ms. Bonilla alleges this

amount is incorrect and different from the amount reported to other credit reporting agencies. She asserts Ms. Basich, Mr. Foluke, and the Credit Union's reporting to Check Systems, Inc. of an incorrect amount is "libel defamation of character," negligent, malicious, and "Defendant is seeking unfair and unjust enrichment."[31] Ms. Bonilla also alleges someone took $600 of "secured money" and "there is no present right to security funds and/or interest on account or money received by [Credit Union] January 20th of 2016 from Plaintiff [sic]."[32]

Ms. Bonilla disputed the Credit Union's reported delinquencies with all credit reporting agencies in May, July, September, October, and December 2019 and January and March 2020 and her credit reports regarding her accounts at the Credit Union read: "Account in dispute-reported by subscriber/Account information disputed by customer under the Fair Credit Reporting Act."[33] Ms. Bonilla alleges "Defendant," in response to her disputed charges with the credit reporting agencies, reported back to the credit reporting agencies its accounting is accurate, and Ms. Bonilla's two accounts are fraudulent and delinquent as of December 2016 even though "Defendant" knew in July 2019 the District Attorney intended to drop charges against Ms. Bonilla.[34]

The reported delinquencies in her accounts at the Credit Union only cleared up after she mailed a notarized letter to the credit reporting agencies and the Credit Union.  An unidentified "Fraud Investigator" at the Credit Union confirmed receipt of her letter on April 2, 2020 and told her of the "remov[al] of her accounts from Check Systems and … credit bureaus."[35]  The Credit Union continued to inaccurately report to credit reporting agencies for three more days (through April 5, 2020).[36]  "Defendants" failed to return monies to her in the amount taken from her savings and credit card accounts despite learning in July 2019 the Philadelphia District Attorney intended to dismiss charges against her.[37]

The charges against her having been *nolle prossed*, "Defendants" "offset" her loan without her authorization; continued to report to credit reporting agencies of a debt owed by Ms. Bonilla; continued to inaccurately report after July 2019; failed to thoroughly investigate the 2016 deposit before calling Philadelphia Police; withheld information from Philadelphia Police; closed her accounts and marked them fraudulent when the accounts were not fraudulent; failed to tell her of the Philadelphia Police Department's investigation; and used abusive tactics when acting as a debt collector.[38]

## II.    Analysis

Ms. Bonilla now claims, as a matter of law, the Credit Union, Mr. Foluke, Ms. Basich, and/or the unidentified branch manager individually and in their capacity as employees of the Credit Union, acted negligently as to their duty to her; had an obligation to thoroughly and timely investigate fraud but failed to do so; breached their duty of care to her; failed to properly train staff; intentionally inflicted emotional distress; negligently inflicted emotional distress; defamed, libeled, and put her in a false light; deprived her of her rights under the United States and Pennsylvania constitutions; and their conduct constitutes unfair, deceptive, or "abusive" practices.[39]

Ms. Bonilla alleges she suffered pain and suffering, mental distress and injury, humiliation, loss, financial hardship, confinement in prison causing her separation from her child, and inability to secure student loans and a mortgage.[40]  She seeks a declaration Defendants violated her federal constitutional rights and the laws of the United States; $5 million in "delay damages, attorney's fees, costs, interest, compensatory (including but not limited to aggravated damages), special damages including all expenses and financial losses incurred as a result of Defendant's actions"; $1 million in compensatory damages for emotional pain and suffering; $5 million in punitive

damages; "[d]eclaratory relief declaring the acts and practices of Defendant and contracts entered [sic] as to be set by this Honorable Court"; attorney's fees and costs; and any other relief awarded by the court.[41]

Ms. Bonilla seeks relief under the Truth in Lending Act ("TILA") and Fair Credit Billing Act, 15 U.S.C. §§ 1601-1667 and its implementing Regulation Z, 12 C.F.R. § 1026; the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 and its implementing Regulation V, 12 C.F.R. part 1022; the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692; the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693; the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), 12 U.S.C. § 5531; and Regulation P, 12 C.F.R. part 1016 of the Gramm-Leach-Bliley Act. Ms. Bonilla seeks relief under Pennsylvania law for negligence,[42] defamation,[43] and possibly other torts under Pennsylvania law.

Having previously granted Ms. Bonilla leave to proceed *in forma pauperis* as she is incapable of paying the fees to commence this civil action,[44] we must study the sufficiency of her complaint under 28 U.S.C. § 1915(e)(2)(B)(ii).[45]   When considering whether to dismiss a complaint for failure to state a claim under § 1915(e)(2)(B)(ii), we use the same standard used under Federal Rule of Civil Procedure 12(b)(6).[46]  "'[A] complaint must contain sufficient factual allegations, taken as true, to 'state a claim to relief that is plausible on its face.'"[47] "We accept all factual allegations in the complaint as true and construe those facts in the light most favorable to the plaintiff."[48]  We are directed by our Court of Appeals to be "mindful of our 'obligation to liberally construe a *pro se* litigant's pleadings …'"[49]

### A.  Ms. Bonilla fails to state a claim under the FDCPA.

Ms. Bonilla claims the Credit Union, Mr. Foluke, Ms. Basich, and a branch manager violated the Fair Debt Collection Practices Act.  She fails to plead a FDCPA claim but we grant her leave to timely amend this claim.

To state a claim under the Fair Debt Collection Practices Act, Ms. Bonilla must allege "(1) she is a consumer, (2) the defendant is a debt collector, (3) the defendant's challenged practice involves an attempt to collect a 'debt' as the [FDCPA] defines it, and (4) the defendant has violated a provision of the FDCPA in attempting to collect the debt."[50]

The FDCPA defines, among other terms, "consumer," "creditor," "debt," and "debt collector." A "consumer" is defined as "any natural person obligated or allegedly obligated to pay any debt."[51]

A "debt" is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment."[52]

The term "debt collector" is defined, in part, "as any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."[53] "Debt collector" specifically excludes "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor."[54]

The term "creditor" is defined as "any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives

an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another."[55]

On the first element, Ms. Bonilla fails to allege she is a consumer as defined by FDCPA.

On the second element, Ms. Bonilla alleges "Defendants have acting [sic] in place of a Debt Collector and used the same practices making them [sic]."[56]   While the definition of debt excludes "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor," courts in this Circuit may impute liability to employees where there is a factual basis to do so.   For example, in *Piper v. Portnoff Law Associates*,[57] the court found the partners of a law firm acting as a debt collector "signed debt collection letters, or authorized others to sign letters for them, and were involved in [the law firm's] day to day operations" collecting debt, rejecting the individuals' argument employees and shareholders of the firm cannot be liable under the FDCPA.[58]   The court in *Piper* cited *Pollice v. National Tax Funding, L.P.*, a decision from our Court of Appeals finding "a general partner exercising control over the affairs of such a partnership may be held liable under the FDCPA for the acts of the partnership."[59]   On the other hand, "it appears unlikely that an employee may be held liable as a debt collector under the FDCPA merely for playing an active role in debt collection activities."[60] Ms. Bonilla does not allege the role of Mr. Foluke, Ms. Basich, or the unnamed branch manager in the collection of debt, to the extent there is a debt to collect.

On the third element, Ms. Bonilla must allege the Credit Union and the individual Defendants' challenged conduct involves an attempt to collect a "debt" as defined by the FDCPA. She does not plead the "debt" Defendants allegedly attempted to collect.   In paragraph 17 of her complaint, Ms. Bonilla alleges:

> During an investigation/dispute/fraudulently, Defendants have offset customer's loan account (without her authorization) and have reported it for the dates/months listed in

9

number 11 to collect what Defendants called a debt (due to an electronic transfer that was deposited into Plaintiff's deposit share account). Defendants continued to report after complaint was found in favor of the Plaintiff which is unfair and unjust enrichment and libel defamation by actual malice and willful misconduct as Plaintiff has disputed multiple times and Defendant has responded as account(s) stated were valid. These practices are deceptive, unfair, and Defendants have used abuse tactics in many areas of this complaint. Defendants have acting in place of a Debt Collector and used the same practices making them.[61]

She alleges in Paragraph 11:

Defendants continued to report to TransUnion LLC, Experian, and Equifax one savings share account and one credit account in the amounts of $1904 and $3334 as delinquent for full months of July of 2019, August of 2019, September of 2019, October of 2019, November of 2019, December of 2019, January of 2020, February of 2020 March of 2020, and two days of April 2020. During the investigation of this dispute, AHFCU (creditor) took legal action to collect the disputed amount, threated Plaintiff's credit rating, reported Plaintiff's accounts as delinquent, and restricted/closed account while Plaintiff disputed charges (with AHFCU direct and to Credit Reporting Agencies). See Exhibit B.[62]

We may reasonably infer Ms. Bonilla considers $1,904 and $3,334 from her savings account and credit account as "debt," although it is unclear as she appears to challenge "Defendants" continued reporting of "delinquencies" to credit reporting agencies even after learning from the Philadelphia District Attorney in July 2019 the criminal charges against her regarding the August 2016 transaction would be dismissed. We would be guessing at the allegations Ms. Bonilla contends is a debt as defined by the FDCPA. We allow her leave to amend her complaint to allege facts identifying a "debt," as defined by the FDCPA, she alleges Defendants attempted to collect.[63]

On the fourth element, Ms. Bonilla must allege Defendants violated a provision of the FDCPA in attempting to collect the debt.  Ms. Bonilla fails to do so.  She alleges only a violation of 15 U.S.C. § 1692, entitled "Congressional findings and declaration of purpose." There are multiple sections of the FDCPA prohibiting certain conduct, for example, harassment and

abuse.[64] Ms. Bonilla does not plead which of the prohibited conduct she alleges Defendants violation.

Ms. Bonilla fails to state a FDCPA claim and we dismiss this claim without prejudice. Given her *pro se* status, we grant Ms. Bonilla leave to timely amend her complaint to plead a FDCPA claim against each Defendant (identifying their separate liability) if she can do so in good faith.

### B.  Ms. Bonilla fails to state a claim under the FCRA.

Ms. Bonilla claims Defendants violated the Fair Credit Reporting Act and its implementing Regulation V.  Ms. Bonilla cites only 15 U.S.C. § 1681, entitled "Congressional findings and statement of purpose."  She does not identify which section of the FCRA she believes Defendants violated.  Regulation V, 12 C.F.R. part 1022, is the federal regulation implementing the FCRA. Regulation V "generally applies to persons that obtain and use information about consumers to determine the consumer's eligibility for products, services, or employment, share such information among affiliates, and furnish information to consumer reporting agencies."[65]

We infer Ms. Bonilla believes Defendants deliberately furnished inaccurate information to credit reporting agencies from July 2019 onward.[66] We do not know whether she believes Defendants violated 15 U.S.C. § 1681s-2(b), which imposes a duty upon furnishers of information to consumer reporting agencies, because she does not cite this section of the FCRA. Ms. Bonilla fails to state a FCRA claim and we dismiss this claim with leave to amend.

"To state a claim under the FCRA against a furnisher of credit information, as opposed to the credit reporting agency itself," Ms. Bonilla must allege three elements: (1) "'[s]he filed a notice of dispute with a consumer reporting agency;'" (2) "'the consumer reporting agency notified the

furnisher of information of the dispute'"; and, (3) "'the furnisher of information failed to investigate and modify the inaccurate information.'"[67]

Ms. Bonilla alleges she disputed with credit reporting agencies Check Systems, Inc., Experian, Equifax, and TransUnion "two accounts" she claims the Credit Union reported as "fraudulent and delinquent" since December 2016.[68] She alleges at some unidentified time, the disputed "accounts" at the Credit Union appeared on her credit report as "Account in dispute-reported by subscriber/Account information disputed by customer under the Fair Credit Reporting Act."[69] Ms. Bonilla alleges the Credit Union continued to inaccurately report the status of the disputed savings and credit card account from July 2019 to March 2020, when the criminal charges against her were *nolle prossed* and a Fraud Investigator from the Credit Union told her he would "remov[e] the accounts from Check Systems and would let the other department know to complete tasks of removing accounts with credit bureaus."[70]

Assuming she intends to bring a claim under this section, we cannot determine the second and third elements: whether the consumer reporting agencies notified the Credit Union and whether furnisher of information failed to investigate and modify the inaccurate information. Ms. Bonilla alleges "Defendant" inaccurately reported to Check Systems, Inc. a charged-off amount of $4,818.35 from July 2019 to early April 2020.[71] She alleges Ms. Basich and Mr. Foluke acted negligently and maliciously in reporting and defamed her.[72] She alleges Defendants reported to TransUnion, Experian, and Equifax delinquencies in her savings share and credit account in the amounts of $1,904 and $3,334, and, during the time she disputed these reported delinquencies, the Credit Union "took legal action to collect the disputed amount, threated [her] credit rating, reported [her] accounts as delinquent, and restricted/closed" her account.[73] But she does not allege the Credit Union failed to investigate and modify inaccurate information after the dispute process.[74]

In fact, Ms. Bonilla alleges the Credit Union's Fraud Investigator called her after receiving her March 11, 2020 letter and advised her delinquent accounts will be removed from reporting.[75]

Ms. Bonilla fails to plead a FCRA claim. We dismiss this claim without prejudice. Given her *pro se* status, we grant Ms. Bonilla leave to timely amend her complaint to identify the section(s) of the FCRA she believes a Defendant violated and the elements necessary to state a FCRA claim (separately as to each Defendant) if she can do so in good faith.

### C. Ms. Bonilla fails to state a claim under TILA.

Ms. Bonilla alleges Defendants violated the Fair Credit Billing Act, Truth in Lending Act and its implementing Regulation Z, and the Electronic Funds Transfer Act.

Congress enacted TILA to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." The Fair Credit Billing Act amended TILA to "buil[d] on TILA's original goal of 'requir[ing] … full disclosure of credit charges … so that the consumer can decide for himself whether the charge is reasonable,' [and] aims 'to protect the consumer against inaccurate and unfair credit billing and credit card practices.'" The FCBA "protect[s] the consumer against inaccurate and unfair credit billing and credit card practices," by, *inter alia*, requiring credit card issuers to correct billing errors.

Ms. Bonilla alleges Defendants violated sections 1601 through 1667 of TILA[76] and Regulation Z, 12 C.F.R. § 1026. There are five parts to TILA, each with multiple sections, governing General Provisions, Credit Transactions, Credit Advertising and Limits on Credit Card Fees, Credit Billing, and Consumer Leases. The complaint does not indicate which section of the FCBA and TILA she believes Defendants violated.

We remind Ms. Bonilla she alleged, in *Bonilla I*, violations of Sections 1661a, regulating credit reports with regard to consumer credit; Section 1666(b)(1), pertaining to the correction of billing errors and defining a "billing error" as "a reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement"; and Section 1666h, prohibiting credit card issuers from offsetting a cardholder's indebtedness from funds held on deposit unless the cardholder authorizes such offset in writing.

To the extent Ms. Bonilla continues to allege, in this second action, the Credit Union "offset" her savings account to satisfy "debt" by adding a deposit overdraft protection account without her authorization in violation of TILA and Regulation Z, and violated the FCBA by reporting to credit reporting agencies a delinquency in her account without noting her dispute over the $5,600 August 2016 deposits, we will dismiss these claims. In *Bonilla I*, we found Ms. Bonilla did not state a claim based on fees or charges involved in credit transactions because the Credit Union did not engage in a credit transaction; it reversed a deposit into a savings account upon determining fraud in the deposit transfer.[77]

Ms. Bonilla may now believe developments since July 2019 show one or more Defendants violated TILA, Regulation Z, and the FCBA. Given her *pro se* status, we grant her leave to amend to allege facts relating to conduct by one or more Defendants after July 2019 to plausibly state a claim under TILA, Regulation Z, and the FCBA she believes each Defendant violated if she can do so in good faith.

### D.  Ms. Bonilla fails to state a claim under EFTA.

Ms. Bonilla sues the Defendants under the Electronic Funds Transfer Act, 15 U.S.C. § 1693. Section 1693 is the "Congressional findings and declaration of purpose" for the Act. Ms. Bonilla does not identify which section of EFTA Defendants allegedly violated.

The purpose of EFTA is "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems" with the "primary objective … the provision of individual consumer rights."[78] EFTA defines the term "electronic fund transfer" as "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account" and includes, but is not limited to, "point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone."[79]

In *Bonilla I*, the Credit Union argued Ms. Bonilla had an overdrawn savings account since 2016 "due to a reversal of charges" the Credit Union made in accord with the terms of the Membership Agreement between it and Ms. Bonilla. The Credit Union cited EFTA's implementing Regulation E which excludes from the definition of "electronic fund transfer" any "intra-institutional automatic transfers under an agreement between a consumer and a financial institution."[80] We agreed with the Credit Union in *Bonilla I*, and concluded it did not offer an overdraft service governed by EFTA and, instead, reversed an intra-institutional transfer between two credit union accounts when it suspected fraud in connection with the transfer.[81]

In this second complaint, Ms. Bonilla alleges a transfer between her account and the account of Ms. Eubanks which she alleges is an "electronic transfer."[82] If the factual basis for Ms. Bonilla's current EFTA claim is the 2016 reversal of the disputed amount deposited in her account from the account of Ms. Eubanks, we dismiss the claim as, as explained above, the intra-institutional transfer is not within the scope of EFTA.

We do not currently read any other allegation regarding an electronic transfer within EFTA. But given her *pro se* status, we grant Ms. Bonilla leave to amend her complaint to allege facts not already resolved in her first case if she can plausibly state a claim under EFTA as to each Defendant separately.

### E. There is no private right of action under the Dodd-Frank Act or its implementing Regulation P.

Ms. Bonilla sues Defendants under the Dodd-Frank Act, 12 U.S.C. § 5531 and Regulation P of the Gramm-Leach-Bliley Act, 12 C.F.R. part 1016.  There is no private cause of action under these statutes.  We dismiss these claims with prejudice.

In 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act in the wake of the 2008 and 2009 financial crisis.[83]  Title X of the Dodd-Frank Act is the Consumer Financial Protection Act which, in turn, established the Consumer Protection Financial Bureau to "'regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws,' … and 'to implement and ... enforce Federal consumer financial law.'"[84]  The Consumer Financial Protection Act prohibits "unfair, deceptive, or abusive act[s] or practice[s] under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service" including "consumer loans and debt collection activities."[85]

Ms. Bonilla alleges Defendants violated the Dodd-Frank Act, 12 U.S.C. § 5531 which provides: "The Bureau may take any action authorized under part E to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service."[86]  The Dodd-Frank Act vests authority in the Consumer Financial Protection Bureau to enforce section 5531.  There

is no private right of action under section 5531 and "courts have commonly declined to read private causes of action into provisions of Dodd–Frank that do not explicitly provide for them."[87]

Ms. Bonilla sues Defendants under Regulation P, 12 C.F.R. part 1016 of the Gramm-Leach-Bliley Act.[88]  Congress passed the Gramm-Leach Bliley Act  in 1999 to protect the privacy of consumers' personal financial information.  Regulation P of the Act "governs the treatment of nonpublic personal information about consumers by the financial institutions … [and] (1) Requires a financial institution to provide notice to customers about its privacy policies and practices; (2) Describes the conditions under which a financial institution may disclose nonpublic personal information about consumers to nonaffiliated third parties; and (3) Provides a method for consumers to prevent a financial institution from disclosing that information to most nonaffiliated third parties by 'opting out' of that disclosure, subject to the exceptions in §§ 1016.13, 1016.14, and 1016.15."[89]

In 2014, the Bureau of Consumer Financial Protection Bureau amended Regulation P through agency rulemaking.[90]  The Bureau specifically noted there is no private right of action under Regulation P.[91]  Lacking a private right of action, we dismiss with prejudice Ms. Bonilla's claims under the Dodd-Frank Act, 12 U.S.C. § 5531 and Regulation P, 12 C.F.R. part 1016.

### F.  We decline supplemental jurisdiction over Pennsylvania claims.

Ms. Bonilla *pro se* alleges a variety of state law claims against Defendants, specifically referring in paragraph 1 to Pennsylvania's comparative negligence statute (which we construe as a common law negligence claim) and defamation statute. She mentions intentional infliction of emotional distress, negligent infliction of emotional distress; breach of duty of care; failure to properly train employees; and unfair and deceptive trade practices.[92]  We have no basis to find she

states a claim for any of these torts.  But we first decline to exercise supplemental jurisdiction over the state law claims.

> We may decline to exercise supplemental jurisdiction over state law claims where:
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.[93]

We today dismiss Ms. Bonilla's federal claims over which we exercised our original jurisdiction under 28 U.S.C. § 1331. Without federal claims, we are left with state law claims involving non-diverse parties. Our Court of Appeals directs we "must decline" to exercise supplemental jurisdiction where we dismissed all claims over which we had original jurisdiction "unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."[94]  We see no interests in judicial economy or convenience providing any justification to exercise supplemental jurisdiction.  As to the fairness to the parties, to the extent Ms. Bonilla's new claims arise out of Defendants' conduct since July 2019, she is within Pennsylvania's one-year statute of limitations for defamation[95] and two-year statute of limitations for personal injury actions.[96]  We decline to exercise supplemental jurisdiction over Ms. Bonilla's state law claims and dismiss the state law claims without prejudice to her timely pleading them in state court or including them in an amended complaint consistent with this Memorandum and today's Order.

**III. Conclusion**

We dismiss with prejudice claims under the Dodd-Frank Act and Regulation P as there is no private right of action for Ms. Bonilla. We dismiss without prejudice the remainder of her federal and Pennsylvania claims and will allow Ms. Bonilla leave to timely amend her complaint to state claims not dismissed with prejudice, if she can do so consistent with the Law and her obligations under Federal Rules of Civil Procedure 8 and 11.

---

[1] Ms. Bonilla identifies this individual defendant as "Bruce Foluke" and, in one paragraph, "Bruce Fulke." We will adopt the complaint's most consistent reference, Bruce Foluke.

[2] ECF Doc. No. 2 at ¶ 3.

[3] *Id.* at ¶ 11.

[4] *Id.* at ¶ 12.

[5] *Id.* at ¶ 13.

[6] *Id.* at ¶ 19.

[7] *Id.* at ¶ 9.

[8] *Id.* at ¶ 10.

[9] *See* Criminal docket report CP-51-CR-0000237-2018 (Phila. Court of Common Pleas).

[10] *Id.*

[11] No. 18-3293 ("*Bonilla I*").

[12] *Bonilla I*, No. 18-3293, ECF Doc. No. 34 at ¶ 10.

[13] *Id.* at ¶ 10; ECF Doc. No. 44 at ¶¶ 6-8, 10.

[14] ECF Doc. No. 44 at ¶ 7; ECF Doc. No. 44-2 at 26. The Court uses the pagination assigned to the document by the CM/ECF docketing system.

[15] ECF Doc. No. 44 at ¶ 7; ECF Doc. No. 44-3 at 1.

[16] ECF Doc. Nos. 29, 30.

[17] ECF Doc. No. 34.
[18] 15 U.S.C. § 1693, *et seq.*

[19] 12 C.F.R. § 205.17.

[20] 15 U.S.C. § 1601, *et seq.*

[21] 15 U.S.C. §§ 1666-1666j.

[22] 12 C.F.R. pt. 1026.

[23] *Bonilla I*, 2019 WL 1506012 (E.D. Pa. Apr. 4, 2019).

[24] *Id.* at *3-*4.

[25] *Id.* at *4.

[26] ECF Doc. No. 2 at ¶ 16.

[27] The criminal docket report shows the charges were *nolle prossed* on March 11, 2020. *See* Criminal docket report CP-51-CR-0000237-2018 (Phila. Court of Common Pleas).

[28] ECF Doc. No. 2 at ¶ 11.

[29] *Id.*

[30] *Id.* at ¶ 12.

[31] *Id.*

[32] *Id.* at ¶ 13.

[33] *Id.* at ¶ 14.

[34] *Id.* at ¶¶ 14-15.

[35] *Id.* at ¶ 15.

[36] *Id.*

[37] *Id.* at ¶ 16.

[38] *Id.* at ¶¶ 17-20.

[39] *Id.* at ¶¶ 21-45.

[40] *Id.* at ¶¶ 46-54.
[41] *Id.* at ¶ 55.

[42] Ms. Bonilla cites Pennsylvania's comparative negligence statute, 42 Pa.C.S.A. § 7102.

[43] Ms. Bonilla cites Pennsylvania's defamation statute, 42 Pa. C.S.A. §§ 8341-8345.

[44] ECF Doc. No. 4.

[45] Section 1915(e)(2)(B)(ii) requires we screen *in forma pauperis* proceedings to "dismiss the case at any time if [we] determin[e] that – (B) the action … -- (ii) fails to state a claim on which relief may be granted …" 28 U.S.C. § 1915(e)(2)(B)(ii). We concern ourselves today with the sufficiency of the complaint's allegations based on federal statute, the claimed basis of our jurisdiction under 28 U.S.C. § 1331.

[46] *Elansari v. Univ. of Pennsylvania*, 779 F. App'x 1006, 1008 (3d Cir. 2019) (citing *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)).

[47] *Id.* (quoting *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012)).

[48] *Id.*

[49] *Dooley v. Wetzel*, No. 19-1684, 2020 WL 1982194, * 4 (3d Cir. Apr. 27, 2020) (citing *Higgs v. Attorney Gen.*, 655 F.3d 333, 339 (3d Cir. 2011), as amended (September 19, 2011)).

[50] *Barbato v. Greystone Alliance, LLC*, 916 F.3d 260, 265 (3d Cir. 2019) (quoting *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 358 (3d Cir. 2018)).

[51] 15 U.S.C. § 1692a(3).

[52] *Id.* at § 1692a(5).

[53] *Id.* at § 1692a(6).

[54] *Id.* at § 1692a(6)(A).

[55] *Id.* at § 1692a(4).

[56] ECF Doc. No. 2 at ¶ 17.

[57] 274 F.Supp.2d 681 (E.D.Pa. 2003), *aff'd*, 396 F.3d 227 (3d Cir. 2005).

[58] *Id.* at 689.

[59] *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 405, n.29 (3d Cir. 2000), *abrogated on other grounds*, *Tepper v. Amos Fin., LLC*, 225 F.3d 379 (3d Cir. 2018). *See also*, *Cidern v. Stephens and Michaels Assoc., Inc.*, No. 14-308, 2015 WL 7756009, at *7-*8 (D.N.J. Nov. 30, 2015) (recognizing cases imposing individual liability under the FDCPA).

[60] *Yentin v. Michaels, Louis & Associates, Inc.*, No. 11–0088, 2011 WL 4104675, at *6 (E.D.Pa. Sept. 15, 2011).

[61] ECF Doc. No. 2 at ¶ 17.

[62] *Id.* at ¶ 11. Exhibit B is not attached to the complaint.

[63] In *Bonilla I*, we found the $3,334 negative balance on the savings account resulted from the Credit Union reversing the $5,600 deposit it believed fraudulent. The Credit Union then charged off the overdrawn savings account in December 2016 with a negative balance of $3,334.92. *See Bonilla I*, 2019 WL 1506012 at * 3-*4.

[64] 15 U.S.C. § 1692d.

[65] 12 C.F.R. § 1022.1(a).

[66] ECF Doc. No. 2 at ¶¶ 11, 12, 14, 15, 17, 19, 42.

[67] *Prater v. Am. Heritage Federal Credit Union*, 351 F.Supp.3d 912, 918 (E.D. Pa. 2019) (quoting *Harris v. Pa. Higher Educ. Assistance Agency/Am. Educ. Servs.*, No. 16-693, 2016 WL 3473347, at *6 (E.D. Pa. June 24, 2016) and citing 15 U.S.C. §§ 1681s-2(b), 1681n & § 1681o).

[68] ECF Doc. No. 2 at ¶¶ 14, 15.

[69] *Id.* at ¶ 14.

[70] *Id.* at ¶ 15.

[71] *Id.* at ¶ 12.

[72] *Id.*

[73] *Id.* at ¶ 11.

[74] Ms. Bonilla repeatedly alleges Defendants failed to properly investigate the August 2016 transfer from Ms. Eubanks' account to Ms. Bonilla's account before contacting Philadelphia Police. *See* ECF Doc. No. 2 at ¶¶ 19, 20, 21, 22, 24, 26, 32. But she does not allege failure to investigate the disputed credit reporting.

[75] *Id*. at ¶ 15.

[76] 15 U.S.C. §§ 1601-1667.

[77] *Bonilla I*, 2019 WL 1506012, at *4.

[78] 15 U.S.C. § 1693(b).

[79] 15 U.S.C. § 1693a(7). *See also* 12 C.F.R. § 1005.3(b)(1) defining the term "electronic fund transfer" as "any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account" and includes, but is not limited to "point-of-sale transfers; automated teller machine transfers; direct deposits or withdrawals of funds; transfers initiated by telephone; and transfers resulting from debit card transactions, whether or not initiated through an electronic terminal."

[80] 12 C.F.R. § 1005.3(c). The language of § 1005.3(c)(5) excludes "automatic transfers by account-holding institution[s]" defined as "[a]ny transfer of funds under an agreement between a consumer and a financial institution which provides that the institution will initiate individual transfers without a specific request from the consumer: (i) Between a consumer's accounts within the financial institution; (ii) From a consumer's account to an account of a member of the consumer's family held in the same financial institution; or (iii) Between a consumer's account and an account of the financial institution, except that these transfers remain subject to" 12 C.F.R. § 1005.10 pertaining to "preauthorized transfers."

[81] *Bonilla I*, 2019 WL 1506012, at *4.

[82] ECF Doc. No. 2 at ¶¶ 9, 17.

[83] *Consumer Fin. Prot. Bureau v. Accrediting Council for Independent Coll. and Sch.*, 854 F.3d 683, 687 (D.C. Cir. 2017).

[84] *Id.* (quoting 12 U.S.C. §§ 5491(a), 5511(a), 5492(a), 5511(b)–(c)).

[85] *Id.* at 687-88 (quoting 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), 5481(5), (15)).

[86] 12 U.S.C. § 5531(a).

[87] *Beider v. Retrieval Masters Creditors Bureau, Inc.*, 146 F.Supp.3d 465, 472 (E.D.N.Y. 2015) (citing *Regnante v. Sec. Exchange Officials*, 14-4880, 2015 WL 5692174, at *7 (S.D.N.Y. Sept. 28, 2015) (collecting cases)).

[88] 15 U.S.C. §§ 6801-6809.

[89] 12 C.F.R. § 1016.1.

---

[90] Amendment to the Annual Privacy Notice Requirement Under the Gramm–Leach–Bliley Act (Regulation P), 79 FR 64057–01, 2014 WL 5426128 (Oct. 28, 2014).

[91] *Id.*, 2014 WL 5426128 at *64068, n.65.  *See also*, *Beavers v. New Penn Financial* LLC, No. 17–747, 2017 WL 4547054, at *10 (E.D. Cal.  2017) (dismissing with prejudice individual's claim under Regulation P).

[92] ECF Doc. No. 2 at ¶¶ 30-45.

[93] 28 U.S.C. § 1367(c).

[94] *Stone v. Martin*, 720 F. App'x 132, 136 (3d Cir. 2017) (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)).

[95] 42 Pa. Cons. Stat. Ann. § 5523.

[96] 42 Pa. Cons. Stat. Ann. § 5524.